UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| MAIFAN SILITONGA and | ) | |
| TERFERI TSEGAYE, | ) | |
| | ) | Case No. 3:16-cv-00029-GFVT |
| Plaintiffs, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM OPINION** |
| | ) | **&** |
| KENTUCKY STATE UNIVERSITY, et al., | ) | **ORDER** |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Maifan Silitonga and Teferi Tsegaye[1] bring this action claiming Kentucky State University, its President, and its Board of Regents violated Plaintiffs' state and federal constitutional rights by, among other things, engaging in discriminatory, retaliatory, and harassing practices regarding Plaintiffs' employment at Kentucky State University. For the reasons that follow, Defendants' request for summary judgment will be **GRANTED** in part and **DENIED** in part.

# I

## A

Plaintiff Maifan Silitonga, a female of Indonesian origin, was employed by Kentucky State University (KSU), a public university, from 2012 until 2015. [R. 1 at 4, 16.] Dr. Silitonga served KSU as a tenure track Associate Professor, Assistant to the Dean of KSU's College of Agriculture, Food Sciences and Sustainable Systems, and Principal Investigator in the Division

---

[1] Although the caption of this case identifies "Terferi Tsegaye" as a plaintiff in this matter, the Court recognizes that all subsequent pleadings identify this plaintiff as "Teferi Tsegaye." The reason for the Court's improper caption is due to the Complaint's misspelling on Plaintiff Tsegaye's first name.

of Environmental Studies and Sustainable Systems.  [*See* R. 19-7 at 8.]  Plaintiff Teferi Tsegaye,

a male of Ethiopian origin, was employed by KSU from 2011 until his resignation in October

2016.  [R. 1 at 16; R. 12-1 at 1; R. 20 at 2.]  For at least some of that time, Dr. Tsegaye served as

Associate Vice President of Agriculture Administration and Land Grant Programs and Dean of

the College of Agriculture, Food Science and Sustainable Systems.  [R. 19-1 at 2.]  He also

served as Professor of Agriculture.  [R. 19-1 at 3.]  In July 2014, KSU hired Defendant Raymond

Burse, who served as interim President, and then President, until his resignation in May 2016.

[R. 12-1 at 2; R. 17-3 at 6, 10.]

     Prior to President Burse's arrival, KSU advertised an available position, interviewed

candidates, and, in June 2014, hired Blair Hess, a Caucasian female.  [R. 12-1 at 2; R. 19 at 3.]

Dr. Tsegaye was involved with this hiring; however, Hess's employment papers were not signed

prior to Burse's arrival.  [R. 12-1 at 2.]  Burse refused to sign Hess's employment forms because

Hess lacked a master's degree, which Burse believed the position required.  [*Id.*]  Whether the

position required, rather than preferred, applicants to have a master's degree was at the center of

the first disagreements between Burse and Dr. Tsegaye.  [*See* R. 17-1 at 34-35.]  President Burse

held a meeting with Dr. Tsegaye and Gary Meiseles, then-Director of Human Resources, to

address the posting's flaw.  [R. 20 at 2.]  Regarding the discrepancy, Dr. Tsegaye testified that

"probably a word was changed from masters preferred to masters required."  [R. 17-1 at 35.]

Ultimately, Hess maintained her employment.  [R. 12-1 at 5.]

     Dr. Tsegaye understood President Burse's dissatisfaction with Hess's hiring to be due to

Hess being Caucasian.  [R. 19 at 3.]  While expressing to Dr. Tsegaye that KSU needed more

"people like me," Burse tapped his wrist – a gesture Dr. Tsegaye understood to mean President

Burse felt KSU needed to hire more African Americans.  [*Id.*]  Burse admits he was concerned

with the lack of diversity in the land grant program due to the United States Department of Agriculture (USDA) raising the issue through its Civil Rights Division. [R. 12-1 at 2.] Burse and Dr. Tsegaye continued to disagree over Hess's hiring and retention. Following this controversy, Burse demanded Dr. Tsegaye resign; Dr. Tsegaye refused. [R. 19 at 3-4.]

During late 2014, Dr. Tsegaye was hospitalized for spinal surgery that resulted in the limited use of his dominant hand. [R. 4.] Although his leave was approved, Dr. Tsegaye claims that while he was in the hospital "President Burse demanded that Tsegaye be available to speak about University business." [*Id.*] Moreover, upon Dr. Tsegaye's return to work, and after Burse knew Dr. Tsegaye could not write, Burse required Dr. Tsegaye to "take notes in faculty meetings, clearly harassing him in front of his colleagues." [*Id.*]

The next issue of controversy revolved around the termination of April Trent in early 2015. Trent, a Caucasian female, was the Director of the Rosenwald Center for Families and Children, a program situated within KSU's College of Agriculture, Food Science, and Sustainable Systems. [R. 19 at 4.] Like Hess, Dr. Tsegaye was involved with the interviewing and hiring of Trent. [R. 19 at 4-5.] In March 2015, President Burse instructed Drs. Silitonga and Tsegaye to terminate Trent. [R. 1 at 10.] According to Defendants, complaints had been received concerning the Rosenwald Center, "including complaints by a mother criticizing Ms. Trent for not showing adequate attention to a special needs child." [R. 12-1 at 3.] Also, the Rosenwald Center had been understaffed, and Dr. Silitonga was working to address the issue. [R.19 at 5.] Burse indicated to Dr. Tsegaye that Trent, like Hess, did not "represent KSU." [*Id.*] Again, Dr. Tsegaye took this to mean Trent needed to be terminated due to her race. [*Id.*] Drs. Silitonga and Tsegaye "made it clear to President Burse, as well as Human Resources [ ], that they [ ] disagreed with the firing of April Trent, did not understand why she was being

terminated, and did not believe she should be terminated." [*Id.*] However, KSU Human Resources ultimately and abruptly terminated Ms. Trent at a meeting in which Drs. Tsegaye and Silitonga were present but refused to handle the separation. [R. 17-4 at 42, 52-58.]

Following Trent's firing, President Burse received notice that Plaintiffs had not carried out Trent's termination. [R. 19 at 5.] Sometime thereafter, Plaintiffs contacted an attorney, who sent Burse a letter notifying Burse that Plaintiffs believed Trent's termination to be racially motivated. [R. 19-3.] Within a few months of the attorney sending Burse the letter, Dr. Silitonga received her termination letter and Dr. Tsegaye received a letter notifying him that his appointment as Dean/Director of the College of Agriculture, Food Science, and Sustainable Systems would not be renewed. [*See* R. 19-2; R. 19-1.]

The record clearly indicates Drs. Silitonga and Tsegaye opposed Trent's termination. According to Defendants, "[b]oth Drs. Tsegaye and Silitonga refused to terminate Ms. Trent and instead resisted her termination. President Burse then advised Dr. Silitonga that her contract would not be renewed for the following year. She left the University in June, 2015." [R. 12-1 at 3.] However, Burse actually sent Dr. Silitonga a Notice of Non-reappointment of Tenure-Track Appointment in December 2014, some three months prior to Ms. Trent's termination. [*See* R. 19-8 at 2.] And, while it is true Dr. Silitonga left KSU in June 2015, she was actually "separated from employment" with KSU, effective immediately, by way of a letter from KSU Human Resources dated June 5, 2015. [R. 19-2 at 2.] According to the Plaintiffs, this termination came while Dr. Silitonga was under contract for the 2014-2015 academic year. [*See* R. 19 at 23; R. 19-7.]

On June 30, 2015, Dr. Tsegaye received a letter stating his positions as Associate Vice President and Dean would not be renewed past June 30, 2015. [R. 19-1 at 2.] He was offered a

contract to continue as Professor of Agriculture for the 2015-16 academic year, which he accepted. [*Id.* at 3-4.] This change in status resulted in a $30,000 decrease in Dr. Tsegaye's annual salary. [R. 1 at 12.] Dr. Tsegaye resigned from KSU in October 2016, subsequent to the commencement of this action. [*See* R. 12-1 at 3.]

During the time Dr. Silitonga was employed at KSU, she claims she endured harassment other than outlined above. According to Plaintiffs, in November 2014, President Burse, in a meeting with other KSU personnel, called Dr. Silitonga incompetent. [R. 19 at 17.] "Silitonga was shaken and her head was down, Burse then screamed at her and told her to 'look at him.'" [*Id.*] Burse again called her incompetent at another meeting on the same date. [*Id.* at 18.] During the second meeting, Dr. Silitonga asked about certain University funds, and Plaintiffs' claim Burse responded by screaming, "I don't want you or your people to ever mention Fund Balance again. You hear me![] You should operate based on what I give you to operate on." [*Id.*] According to Plaintiffs, in a meeting in December 2014, Burse "stared at Silitonga for a prolonged period of time. He then proceeded to call her incompetent, lazy and informed her that the country club attitude had to stop." [*Id.*] In a February 2015 meeting, "President Burse began harassing, intimidating and ridiculing Silitonga for trying to look cute and that if she would stop trying to look cute she would have glasses that she could read with." [*Id.*] Burse then made Dr. Silitonga wear his glasses, which made her vision worse. [*Id.*] In another meeting, Burse began "making fun of" Dr. Silitonga, and "claimed he heard she had claws. He then attempted to lean over the table to see her hands. Silitonga again feeling ridiculed, harassed and intimidated hid her hands from him despite his demands." [*Id.*]

Drs. Silitonga and Tsegaye ultimately filed EEOC complaints. [*See* R. 1-1; R. 1-2.] In January 2016, they both received their EEOC right-to-sue letters. [R. 1-1; R. 1-2.] In April

2016, Drs. Silitonga and Tsegaye brought suit against KSU, its President, and its Board of Regents for violation of federal and state civil rights law regarding their employment with KSU. [*See generally* R. 1.] Defendants now seek summary judgment.

## B

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corporation of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated another way, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial. Fed. R. Civ. P. 56; *Hall Holding*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment."

*Hall Holding*, 285 F.3d at 424 (internal citations omitted).

When applying the summary judgment standard, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the Court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.*

## II

The Defendants' Motion for Summary Judgment raises jurisdictional questions of immunity. Additionally, the Court finds there to be a jurisdictional question as to whether the Plaintiffs have pleaded a legally cognizable injury with regard to certain claims. Therefore, the Court will address these jurisdictional questions prior to addressing the substantive arguments of Defendants' summary judgment motion.

## A

Generally, the Eleventh Amendment bars suits against states and state agencies in federal court unless a state legislature has waived immunity or has consented to being sued in federal court. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008). Additionally, "a suit against a state official in his or her official capacity . . . is a suit against the official's office." *Will*, 491 U.S. at 71. For the purposes of this sovereign immunity analysis, it is important to note that Plaintiffs seek civil damages, but the boilerplate language used to request injunctive relief is too generic to preclude official capacity

defendants from asserting Eleventh Amendment immunity. [2]  [R. 1 at 23]; *see also Crosby v. Univ. of Kentucky*, 863 F.3d 545, 558 (6th Cir. 2017); *Cox v. Shelby State Comm. College*, 48 Fed. App'x 500, 504-05 (6th Cir. 2002).

Plaintiffs assert several Title VII and § 1983 claims, as well as their equivalent state claims.  The Title VII claims are not barred by the Eleventh Amendment as Title VII was enacted under § 5 of the Fourteenth Amendment wherein Congress expressly abrogated the States' sovereign immunity.  *See Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000).  Similarly, the Commonwealth of Kentucky has waived sovereign immunity for claims made under the Kentucky Civil Rights Act (KCRA).  *See Department of Corrections v. Furr*, 23 S.W.3d 615, 616 (Ky. 2000).  Thus, the KCRA claims asserted in Counts 1-4 are not barred by sovereign immunity.  As a result, all Title VII and KCRA claims set forth in Counts 1-4 of Plaintiffs' Complaint survive Defendants' claim of sovereign immunity.

Plaintiffs seem to concede the § 1983 claims set forth in Count Five and Six against Defendants in their official capacities are barred by sovereign immunity.[3]  [R. 19 at 20 ("Plaintiffs are aware that claims made pursuant to 42 U.S.C. § 1983 against state entities and offical[] individuals in their official capacities are generally not cognizable and are barred by sovereign immunity."]  However, Plaintiffs seek to hold KSU vicariously liable for the actions of President Burse and the Board of Regents.  There is a very narrow circumstance wherein a governmental entity could be held vicariously liable for the actions of its employee when such

---

[2] The only mention of injunctive relief in Plaintiffs' Complaint comes in the last line of their pleading asking "[f]or any and all other relief that the Plaintiffs may be entitled to under law including injunctive relief."  [R. 1 at 23.]  While this injunctive relief request is more specific than the boilerplate language in *Crosby, see* 863 F.3d at 558, Plaintiffs fail to articulate with specificity what injunctive relief they desire.  Therefore, the Court construes the Complaint to request only civil monetary damages.

[3] The Court notes that under Kentucky law, Kentucky State University is a land-grand institute of higher education and is an agency of the state.  *See* KRS § 164.290.

actions constitute a "custom" or "practice." *See infra* Section III.E.  Therefore, the Court will withhold ruling on sovereign immunity with regard to the § 1983 claims set forth in Counts Five and Six against the official-capacity defendants until after analyzing Plaintiffs' "custom" and "practice" argument later in this Order.  *See infra* Section II.E.

<h1 style="text-align:center">B</h1>

Plaintiffs maintain that their § 1983 claims and the claims brought under § 2 of the Kentucky Constitution against the individual-capacity defendants are not barred by sovereign immunity.  [R. 19 at 20-21.]   However, Defendants also assert the defense of qualified immunity [*see* R. 21-1 at 8-9], which shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "[W]hether qualified immunity attaches to an official's actions is a purely legal question for the trial judge to determine prior to trial."  *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988).  Two questions are asked to determine whether an official is entitled to qualified immunity: (1) "Taken in the light most favorable to the party asserting injury, do the facts alleged show the officer's conduct violated a constitutional right?" and (2) was the right "clearly established . . . in light of the specific context of the case[?]" *Crosby*, 863 F.3d at 552 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Finally, once a defendant raises the qualified immunity defense, "the burden shifts to the plaintiff, who must demonstrate both that the official violated a constitutional or statutory right, and that the right was so clearly established at the time of the alleged violation 'that every reasonable official would have understood that what he [was] doing violate[d] that right .'" *Thomas v. Plummer*, 489 F. App'x 116, 119 (6th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Plaintiffs claim they were denied their constitutional and statutory rights to due process in that they were neither notified in writing of the nature of the charges leading to the adverse employment actions with ten days' notice, nor were they afforded an opportunity for a hearing prior to, or even after, the adverse employment actions.  [R. 1 at 17-21; R. 19 at 22-24.]  Plaintiffs contend that their "interests in continuing employment with Kentucky State University are property interests" protected by both the Fourteenth Amendment of the United States Constitution and the Kentucky Constitution.  [R. 1 at 20; R. 19 at 22.]  Additionally, Plaintiffs claim that Defendants' "selective enforcement of the Kentucky State University Faculty Handbook and violation of the constitutional rights to due process" infringed upon the Plaintiffs' rights to equal protection under the Fourteenth Amendment of the United States Constitution and the Kentucky Constitution.  [R. 1 at 21-23; R. 19 at 25.]  Plaintiffs assert a violation of Kentucky law, which reads in pertinent part,

> no . . . faculty member shall be removed except for incompetence, neglect of or refusal to perform his duty, or for immoral conduct.  A president or faculty member shall not be removed until after ten (10) days' notice in writing, stating the nature and charges preferred, and after an opportunity has been given him or her to make defense before the Board. . . .

KRS § 164.360(c).

It is settled law that "[s]tate employees who have a property interest in their employment are entitled to certain minimum process before being fired."  *Cox v. Shelby State Community College*, 48 Fed. App'x 500, 507 (6th Cir. 2002) (citing *Cleveland Bd, of Ed. v. Loudermill*, 470 U.S. 532(1985)).  The United States Supreme Court has held that "college professors and staff members dismissed during the terms of their contracts have interests in continued employment that are safeguarded by due process."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-577 (1972) (citing *Wieman v. Updegraff*, 344 U.S. 183 (1952)).

It is important to distinguish the employment actions taken against Drs. Silitonga and Tsegaye. Dr. Silitonga was terminated from her employment, effective immediately, via a letter from KSU's Director of Human Resources dated June 5, 2015. [R. 19-2.] According to Plaintiffs, this termination came at a time when Dr. Silitonga was under contract for the 2014-2015 academic year. [*See* R. 19 at 23.] Dr. Tsegaye, on the other hand, was not terminated. Dr. Tsegaye's appointments as Associate Vice President and Dean were not renewed, but he received a contract offer to continue as Professor of Agriculture. [R. 19-1.] There is no allegation that his demotion occurred without his contract expiring, but, nevertheless, Dr. Tsegaye was not given notice or a hearing prior to the demotion. Plaintiffs do not allege these actions violated any tenure-protected rights. However, Dr. Silitonga does allege her termination came while she was under contract.

While this distinction is nuanced, it is vital to the area of qualified immunity as it relates to the statutory violation alleged. As stated earlier, Plaintiffs allege a violation of KRS § 164.360(c), which states university faculty members may not be *removed* except under certain circumstances. (Emphasis added.) Because Dr. Tsegaye was not removed, he cannot maintain a cause of action under this statutory scheme; however, Dr. Silitonga can. Therefore, taking the facts in the light most favorable to the party asserting injury, the Plaintiffs have established that the Defendants' conduct violated Dr. Silitonga's constitutional and statutory right. *See Crosby*, 863 F.3d at 552 (quoting *Saucier v. Katz*, 533 U.S. at 201). In determining whether "the right was so clearly established at the time of the alleged violation 'that every reasonable official would have understood that what he [was] doing violate[d] that right,'" *see Thomas*, 489 F. App'x at 119, the Court determines that the right was clearly established with regard to Dr. Silitonga, but that it was not with regard to Dr. Tsegaye. Therefore, regarding Counts Five and

Six, only Dr. Silitonga's § 1983 claims will proceed past qualified immunity.

## C

Before reaching the substance of Plaintiffs' allegations and Defendants' Motion for Summary Judgment arguments, the Court must address whether certain claims fail to implicate a legally cognizable injury. Counts Five and Six of Plaintiffs' Complaint set forth due process and equal protection claims under 42 U.S.C. § 1983 and § 2 of the Kentucky Constitution. [R. 1 at 17-22.] To the extent Plaintiffs bring a separate state cause of action pursuant to § 2 of the Kentucky Constitution, those claims are barred because "Kentucky law does not recognize a cause of action for alleged violations of Kentucky constitutional rights and [] Kentucky's General Assembly has refused to create a constitutional tort akin to a federal *Bivens* action for violations of Kentucky's Constitution." *Litz v. Univ. of Kentucky*, No. 5:11-164, 2013 WL 2257696, at *4, n.2 (E.D. Ky. May 22, 2013) (citing *Faul v. Bd. of Educ. of Danville Indep. Sch.,* No. 5:12–CV–277–KSF, 2013 WL 1511746, at *2 (E.D. Ky. Apr. 9, 2013)). Therefore, Plaintiffs' claims under § 2 of the Kentucky Constitution, as set forth in Counts 5 and 6 of the Complaint, must be dismissed as to all defendants.

Additionally, a suit against a government official in his or her individual capacity "seek[s] to impose personal liability on [the] official for actions taken under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *see also Baar v. Jefferson County Bd. of Educ.*, 476 F. App'x 621, 634 (6th Cir. 2012); *Jackson v. Murray State Univ.*, 834 F. Supp. 2d 609, 614 (W.D. Ky. 2011). In such an action, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Jackson*, 834 F. Supp. 2d at 614. Thus, as other federal district courts in this state have observed, "[a] government official may only be held

liable for his or her own individual acts of misconduct." *Jackson*, 834 F. Supp. 2d at 614

(quoting *Weathers v. Kentucky State Univ.*, No. 3:09-04-DCR, 2009 WL 1683711, at *3 (E.D.

Ky June 16, 2009). Because Plaintiffs fail to allege the Regents, individually, engaged in any

misconduct, Plaintiffs' Title VII, § 1983, and KCRA claims must be dismissed against each of

the Regents in their individual capacities. However, these claims remain with regard to President

Burse in his individual capacity because Plaintiffs allege that Burse, through his own individual

actions, violated the Constitution.

Lastly, Title VII imposes liability on employers only. *See* 42 U.S.C. §§ 2000e-2(a),

2000e-3(a). Although Plaintiffs do not allege President Burse is an employer, to the extent they

contend Burse is liable under Title VII, those claims will be dismissed because Burse is not an

employer for Title VII purposes. For the same reason, and to the extent alleged, any Title VII

claim against the Regents in their individual capacities must be dismissed.

In summation, the only claims that survive these jurisdictional questions are: (1) Count

One's Title VII and KCRA claims against KSU, the Board of Regents, and each of the Regents

in their official capacities, as well as Count One's KCRA conspiracy and retaliation claims

against President Burse in his individual capacity; (2) Count Two's Title VII and KCRA claims

against KSU, the Board of Regents, and each of the Regents in their official capacities, as well as

Count Two's KCRA conspiracy and retaliation claims against Burse in his individual capacity;

(3) Count Three's Title VII and KCRA claims against KSU, the Board of Regents, and each of

the Regents in their official capacities, as well as Count Three's KCRA claim against Burse in

his individual capacity; (4) Count Four's Title VII and KCRA claims against KSU, the Board of

Regents, and each of the Regents in their official capacities, as well as Count Four's KCRA

claim against Burse in his individual capacity; (5) Dr. Silitonga' Count Five § 1983 claim against

KSU, the Board of Regents, each of the Regents in their official capacities, as well as Burse in his individual capacity; and (6) Dr. Silitonga's Count Six § 1983 claim against KSU, the Board of Regents, each of the Regents in their official capacities, as well as Burse in his individual capacity.

### D

With those jurisdictional questions addressed, the Court now turns to the merits of the Defendants' substantive summary judgment arguments as to all remaining counts. The Court will address those arguments in order of the claims asserted in the Complaint. Counts One through Four of the Complaint allege that Defendants violated Plaintiffs' rights under Title VII and the KCRA, which, in relevant part, prohibits employers from discriminating against employees on the basis of sex or national origin, *see* KRS § 344.040, and prohibits persons from retaliating, or conspiring to retaliate, against other persons who oppose discriminatory practices in the workplace, *see* KRS 344.280(1). Claims brought under the KCRA are analyzed under the same framework used to analyze similar federal claims. *See Montell v. Diversified Clinical Servs.*, 757 F.3d 497, 504 (6th Cir. 2014) (citing *Hamilton v. Gen. Elec. Co.*, 556 F. 3d 428, 435 (6th Cir. 2009); *see also Brooks v. Lexington-Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 801-01 (Ky. 2004).

"The language of KCRA generally tracks the language of Title VII and, thus, 'should be interpreted consonant with federal interpretation.'" *Morris*, 201 F.3d at 793 (quoting *Meyers v. Chapman Printing Co., Inc.*, 940 S.W.2d 814, 820 (Ky. 1992)). However, the Opposition Clause of Title VII differs in one very important way from KCRA's equivalent retaliation statute, KRS § 344.280. Title VII prohibits only retaliation by "an employer." 42 U.S.C. § 2000e-3(a). The

KCRA prohibits retaliation by "a person." KRS § 344.280. Thus, the KCRA is broader in that it permits liability on individuals. *See Morris*, 201 F.3d at 794.

**1**

Count One of the Complaint alleges that Defendants conspired to retaliate, and did retaliate, against Dr. Tsegaye due to Dr. Tsegaye's opposition and refusal to participate in racially discriminatory conduct, which has been made unlawful under Title VII and the KCRA. [R. 1 at 7-10.] As an initial matter, Plaintiffs "do[] not oppose the dismissal of any Title VII retaliation claims against Burse in his individual capacity." [R. 19 at 11, n.3.] Furthermore, while Plaintiffs' Complaint alleges conspiracy and retaliation, [R. 1 at 9], the facts set forth in Plaintiff's pleadings do not state with whom President Burse is alleged to have conspired. [*See* R. 1; R. 19; R. 34.] Consequently, all Title VII and KCRA conspiracy allegations as to Count One shall be dismissed.

Where a plaintiff seeks to prove a claim of retaliation under Title VII or the KCRA, a burden shifting framework applies. First, the plaintiff must establish a prima facie case of retaliation by showing:

> (1) that she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham Cty. Fiscal Court*, 201 F. 3d 784, 792 (6th Cir. 2000) (citations omitted). Once a plaintiff makes out a prima facie case, the burden then shifts to the defendant employer to "'articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Once defendant employer articulates a nondiscriminatory reason for its action, the burden shifts back to the plaintiff, who "then must

demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). While the burden of production shifts throughout the analysis, the burden of persuasion remains with the plaintiff. *Id.* Because Count 1 alleges violations of both Title VII and the KCRA, the Court will address them separately.

**a**

Dr. Tsegaye ultimately fails to establish a prima facie case of retaliation under Title VII. Regarding all four prongs of the *Morris* prima facie test, and in responding to Defendants' Motion for Summary Judgment, Dr. Tsegaye cites only to his deposition to establish the necessary factual support for his retaliation claim. [*See* R. 19 at 3-4, 11-13.] In only one instance does Dr. Tsegaye cite to any other source of evidence. [R. 19 at 4.] There, Dr. Tsegaye cites to a portion of President Burse's deposition, which confirms Burse asked Dr. Tsegaye to resign, and that Dr. Tsegaye complained to the Board of Regents. [*Id.*; R. 17-3 at 89.] Dr. Tsegaye points to no other evidence in the record, other than the statements in his own deposition, to substantiate the Title VII retaliation claim alleged in Count One. While the conduct Dr. Tsegaye describes, if true, is troublesome and concerning, Dr. Tsegaye must provide more evidence to support his claim in order to survive summary judgment. Even if these assertions were sufficient to support a prima facie showing – which they are not – there is not enough evidence to survive summary judgment because Dr. Tsegaye has neither gone beyond the pleadings to provide specific facts demonstrating a genuine issue for trial, nor provided significant probative evidence to support his position. *See* Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 324; *Hall Holding*, 285 F.3d at 424. Therefore, Defendants' will be granted summary judgment on Dr. Tsegaye's Title VII retaliation claim, as set forth in Count One.

**b**

The Court now turns to Dr. Tsegaye's retaliation claim under KCRA, as alleged in Count 1. "The language of KCRA generally tracks the language of Title VII and, thus, 'should be interpreted consonant with federal interpretation.'" *Morris*, 201 F.3d at 793 (quoting *Meyers v. Chapman Printing Co., Inc.*, 940 S.W.2d 814, 820 (Ky. 1992)). The facts alleged to substantiate the KCRA retaliation claim in Count One are the same substantively as what has been set forth above. *See supra* Section II.D.1.a. Therefore, because no additional supportive evidence is provided to support Dr. Tsegaye's KCRA retaliation claim in Count One, it will not survive summary judgment.

**2**

Count Two of the Complaint also sets forth Title VII and KCRA conspiracy and retaliation claims. [R. 1 at 10-13.] Count Two relates specifically to the firing of April Trent, a Caucasian woman, who served as the Director of the Rosenwald Center for Families and Children at KSU. [*Id.*] Again, and as an initial matter, Plaintiffs "do[] not oppose the dismissal of any Title VII retaliation claims against Burse in his individual capacity." [R. 19 at 11, n.3.] Also, while Plaintiffs' Complaint alleges conspiracy and retaliation, [R. 1 at 9], the facts set forth in Plaintiff's pleadings do not state with whom President Burse is alleged to have conspired regarding the claims set forth in Count 2. [*See* R. 1; R. 19; R. 34.] Therefore, all conspiracy allegations as to Count 2 will be dismissed.

As to the substance of the claims, Title VII provides, in relevant part:

It shall be an unlawful employment practice for an employer –

(1) To fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e-2(a).  The Opposition Clause of Title VII states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  Thus, the Opposition Clause "prohibits an *employer* from retaliating against an employee who has 'opposed' any practice by the employer made unlawful under Title VII. . . ."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000) (emphasis added); *see also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791-92 (6th Cir. 2000). Additionally, the Sixth Circuit has acknowledged that "severe and pervasive supervisor harassment that is engaged in because an individual 'has opposed any practice made an unlawful employment practice' by Title VII also can constitute discrimination under" the Opposition Clause.  *Morris*, 201 F.3d at 791-92.

Having laid out the substantive legal framework of Plaintiffs' Count Two retaliation claims, the Court will now analyze Plaintiffs' Title VII and KCRA retaliation claims in Count Two under the *Morris* burden-shifting test articulated above.  *See supra* Section II.D.1.  Because Count Two pleads violations of Title VII and KCRA, the Court will address them in turn.

### a.

Under Title VII, Plaintiffs ultimately establish a prima facie case of retaliation in Count Two.  Regarding the first prong of the *Morris* test, the record clearly indicates Plaintiffs opposed Trent's termination.  [R. 19 at 5; R. 17-4 at 20-23.]  Corlia Logsdon, the KSU Human Resources employee who ultimately terminated Trent, testified that Drs. Tsegaye and Silitonga both opposed Trent's termination and thought the termination was racially motivated.  [R. 17-4 at 60-61.]  This conduct is protected by Title VII's Opposition Clause.

Regarding the second prong, President Burse was definitely made aware that Plaintiffs opposed Trent's termination. Burse was notified immediately following Trent's termination that Plaintiffs refused to carry out the termination. [R. 19 at 5.] Additionally, on behalf of Plaintiffs, an attorney wrote a letter to Burse notifying him that Plaintiffs believed Trent's termination to be racially motivated. [R. 19-3; R. 17-3 at 156.]

Addressing the third prong, President Burse took adverse action against Plaintiffs by terminating Dr. Silitonga and by demoting Dr. Tsegaye. [R. 19-2; R. 19-1.] Dr. Tsegaye's demotion did not come while he was under contract; instead, his demotion was the result of KSU not renewing his appointment as Dean, an action that resulted in an annual salary decrease of $30,000. [R. 19 at 15.] Title VII prohibits employers from discriminating against an individual "with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a).

Regarding prong four, Plaintiffs state President Burse's testimony and interrogatory responses establish the causal connection between Plaintiffs' protected conduct and the adverse employment action. [*Id.*] Defendants' interrogatory response states specifically that Dr. Silitonga was terminated prior to the expiration of her contract because she refused to terminate April Trent, her refusal to provide certain information to KSU General Counsel, and her refusal to provide Burse with certain information. [R. 19-4 at 10-11.] Regarding Dr. Tsegaye's demotion, Defendants' interrogatory response states, "[t]he specific triggering incidents for the demotion were his refusal to terminate April Trent and his inaccurate reporting on the circumstances of the termination." [*Id.* at 11.]

In an attempt to articulate a nondiscriminatory reason for the adverse employment actions, President Burse states the termination of April Trent was predicated on complaints

received about the Rosenwald Center, and Drs. Tsegaye and Silitonga received adverse employment actions because they were considered to be insubordinate. [R. 12-1 at 3, 6.] In Defendants' interrogatory responses, though, Defendants further explained that the action against Dr. Tsegaye was supported by Dr. Tsegaye's failure to timely complete projects, claiming that President Burse and KSU were violating federal law, and reporting inaccurate information. [R. 19-4 at 11.] But, "[t]he specific triggering incidents for the demotion were his refusal to terminate April Trent and his inaccurate reporting on the circumstances of the termination." [*Id.*]

Plaintiffs suggest that Defendants fail to put forth a nondiscriminatory reason as to the adverse actions they endured. [R. 19 at 15. The Court agrees. All of the reasons set forth by Defendants as reasons for Dr. Silitonga's termination and Dr. Tsegaye's demotion can be construed to revolve around Trent's termination, which Plaintiffs believed to be racially motivated. Therefore, drawing all reasonable inferences in favor of the Plaintiffs, the Title VII retaliation claim asserted in Count Two will survive summary judgment as to KSU, the Board of Regents, and each of the Regents in their official capacities.

### b

The Court now turns to the KCRA claims alleged in Count 2. "The language of KCRA generally tracks the language of Title VII and, thus, 'should be interpreted consonant with federal interpretation.'" *Morris*, 201 F.3d at 793 (quoting *Meyers v. Chapman Printing Co., Inc.*, 940 S.W.2d 814, 820 (Ky. 1992)). The facts alleged to substantiate the KCRA retaliation claim in Count Two are the same substantively as what has been set forth above. *See supra* Section II.D.2.a. Therefore, Plaintiffs' Count Two KCRA retaliation claims will survive summary judgment as to KSU, the Board of Regents, and each of the Regents in their official capacities. Additionally, because KCRA imposes liability on individuals and not just employers, *see supra*

Section II.D, Plaintiffs' Count Two KCRA retaliation claims will survive summary judgment as to President Burse in his official and individual capacities as well.

**3**

Count Three of the Complaint claims that Dr. Silitonga was subjected to harassment and discrimination based on her sex as a female, in violation of Title VII and KCRA. [R. 1 at 13-16.] Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A hostile work environment based on sex discrimination occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993). Importantly, "the conduct underlying a sexual harassment claim need not be sexual in nature. *Any* unequal treatment of an employee *that would not occur but for the employee's gender* may . . . constitute a hostile work environment. . . ." *Williams v. General Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (emphasis in original).

In order for Dr. Silitonga to establish a prima facie case of sex discrimination and hostile work environment, she must establish: (1) that she was a member of a protected class; (2) that she was subjected to unwelcomed harassment; (3) the harassment was based on her sex; (4) the harassment had the effect of unreasonably interfering with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). The Sixth Circuit has held that when assessing the fourth prong of

this test, the court should look at the totality of the circumstances when considering:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably intereferes with an employee's work performance. Conduct must be extreme to amount to a change in the terms and conditions of employment. Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.

*Barrett*, 556 F.3d at 515-16 (citations omitted). With regard to the fifth prong, "employers are vicariously responsible for harassment by supervisors. . . ." *Id.* Further, the plaintiff need not show that the employer knew of the harassing conduct. *Id.* An affirmative defense as to liability is available to employers who can show (1) that the employer "exercised reasonable care to prevent or correct promptly . . . harassing behavior by its supervisor, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid the harm." *Id.* (citing *Burlington Indus. V. Ellerth*, 524 U.S. 742, 765 (1998)).

As mentioned earlier, and which remains true for sex discrimination / hostile work environment cases, the KCRA standard mirrors the Title VII standard, but the KCRA imposes liability on individuals whereas Title VII imposes liability on employers only. *See supra* Section II.D. Again, because Count Three of the Complaint alleges claims under both statutory schemes, they will be addressed in turn.

**a**

Dr. Silitonga establishes a prima facie case of sex discrimination / hostile work environment. Regarding the first prong, Dr. Silitonga, as a female, belongs to a protected class. Regarding the second prong, the evidence in the record suggests Dr. Silitonga was subjected to unwelcomed harassment throughout the time her employment overlapped with President Burse's. In her answers to Defendants' interrogatory, Dr. Silitonga set forth a long and non-

exhaustive list of incidents in which she was subjected to episodes of Burse screaming at her, demeaning her, and belittling her in meetings with other KSU personnel present. [R. 19 at 17.] While this list is evidence put forth by the Plaintiff, at least one deponent, Beverly Downing, former KSU Provost, testified that Burse was "more abusive" toward women than men and that Dr. Silitonga was "one of [President Burse's] main targets." [R. 17-8 at 13-16.] Drawing the evidence in favor of the Plaintiffs, Dr. Silitonga has met the second prong of the analysis.

Regarding the third prong, the evidence in the record suggests that but for Dr. Silitonga being a female, she would not have endured this harassment. Dr. Silitonga claims that, on at least one occasion, President Burse humiliated her in front of her colleagues by staring at her for a prolonged period of time, attacking her about her fingernails, and ridiculing her about trying to act cute. [R. 19 at 18.] Burse substantiates these claim in his Motion, but tries to downplay them. [*See* R. 12-1 at 6]. Further, Burse claims he "spoke to Plaintiffs in order to have them perform their duties as employees." [R. 20 at 3.] He claims that "[a]ll of her allegations relate to incidents where the President was critical of her because of her work at the University. President Burse explained his reference to Silitonga's fingernails was about 'claws that you use for people' who were afraid of her in the Land Grant Program." [*Id.* (quoting R. 17-3 at 204-205.)] Burse's responses suggest at least some of his conduct was not related to Dr. Silitonga's work, and that but for Dr. Silitonga being a female, he would not have made such comments. This is further substantiated in Beverly Downing's deposition. [*See* R. 17-8 at 13-16.] Again, drawing these facts in the light most favorable to Dr. Silitonga, the record contains sufficient evidence that the harassment Dr. Silitonga endured was due to her being a female.

Taking the totality of the circumstances, the record sets forth evidence that the harassment "unreasonably interfered with her work performance by creating an intimidating,

hostile, or offensive work environment." *See Barrett*, 556 F.3d at 515. Regarding the frequency

of the harassment, Dr. Silitonga claims it occurred at least as early as October 2014 and

continued through at least March 2015. [R. 19 at 18.] She also testified that, "this working

environment is so stressful that the constant harassment from the president is unbearable." [R.

17-2 at 50.] Beverly Downing testified that Dr. Silitonga was President Burse's favorite target.

[R. 17-8 at 16.] Based on Downing's testimony, Burse's conduct toward Dr. Silitonga was not a

"mere utterance," but was severe and pervasive enough that others realized President Burse

singled her out. [*See* R. 17-8 at 13-16.] Dr. Silitonga also testified that this interfered with her

work environment because "she was expected to work through this harassment while other,

similarly situated males were not." [R. 19 at 19.] This is further supported by Downing's

testimony. In at least two meetings that Downing attended, Burse had Dr. Silitonga bring her

work product to a meeting, but the meeting had nothing to do with her work product and, instead,

Burse "attack[ed] her. . . ." [R. 17-8 at 15.] The hostility was so prevalent in the meetings that

Downing "tried to talk with her, because he would have the tendency where he would come in

and dog, dog, dog, dog. . . ." [*Id.*] Again, drawing these facts in the light most favorable to Dr.

Silitonga, the evidence suggests Burse's harassment "unreasonably interfered with [Dr.

Silitonga's] work performance by creating an intimidating, hostile, or offensive work

environment." *See Barrett*, 556 F.3d at 515.

  The last prong of the analysis requires the employer to be liable. "Employers are

vicariously responsible for harassment by supervisors. . . ." *Id.* There is no dispute that

President Burse was Dr. Silitonga's supervisor, or at least in her chain of command. While there

exists an affirmative defense to this vicarious liability, *see id.*, Defendants do not assert that

defense.

Drawing all factual inferences in the light most favorable to Dr. Silitonga, the record is sufficient for her to establish a prima facie case of sex discrimination / hostile work environment. As such, Dr. Silitonga's Count Three Title VII sex discrimination / hostile work environment claim against KSU, the Board of Regents, and each Regent in their official capacities survives summary judgment.

### b

The Court now looks to Dr. Silitonga's KCRA claim, as alleged in Count 3. "The language of KCRA generally tracks the language of Title VII and, thus, 'should be interpreted consonant with federal interpretation.'" *Morris*, 201 F.3d at 793 (quoting *Meyers v. Chapman Printing Co., Inc.*, 940 S.W.2d 814, 820 (Ky. 1992)). The facts alleged to substantiate the KCRA discrimination / hostile work environment claim in Count Three are the same substantively as what has been set forth above. *See supra* Section II.D.3.a. Therefore, Dr. Silitonga's Count Three KCRA discrimination / hostile work environment claim will survive summary judgment as to KSU, the Board of Regents, each of the Regents in their official capacities. Additionally, because KCRA imposes liability on individuals and not just employers, *see supra* Section II.D, Plaintiffs' Count Three KCRA discrimination / hostile work environment claim will survive summary judgment as to President Burse in his individual capacity.

### 4

Count Four of the Complaint alleges both Dr. Tsegaye and Dr. Silitonga were discriminated against based on their national origin. [R. 1 at 16-17.] The standard for establishing a prima facie case of national origin discrimination is the same as set forth above for sex discrimination. *See supra* Section II.D.3.

Unfortunately for Drs. Silitonga and Tsegaye, there are few facts to support a claim of

national origin discrimination. Dr. Tsegaye, being of Ethiopian descent, and Dr. Silitonga, being of Indonesian descent, belong to a protected class. However, the extent of the claims against President Burse regarding national origin discrimination is that he made comments such as "Plaintifs did not understand the culture" and "Plaintiffs are not American, and therefore do not understand how we do things around here, or how we operate." [R. 19. At 20.] The only evidence to support these claims are the statements made by Plaintiffs individually in their depositions. [*See id.*] There is no substantiation that such comments were made, or that Burse targeted them because of their national origin. As such, the record is insufficient to support a prima facie case of national origin discrimination. Consequently, Defendants will be granted summary judgment on Count Four's Title VII and KCRA.

### E

Counts Five and Six of the Complaint allege due process and equal protections violations. [R. 1 at 17-22.] The federal claims are that Defendants violated 42 U.S.C. § 1983 by depriving Plaintiffs of their Fourteenth Amendment due process rights (Count Five) and equal protection rights (Count Six). [*Id.*] The state claims are that Defendants violated KRS § 164.360 by depriving them of their due process rights (Count Five) and equal protection rights (Count Six) protected by § 2 of the Kentucky Constitution. [*Id.*] Many of the claims brought under Counts Five and Six have already been dismissed, including all state constitutional claims. *See supra* Section II.A-C. The only remaining claims to be analyzed are Dr. Silitonga's §1983 claims as they relate to KSU, the Board of Regents, and each of the Regents in their official capacities, as well as President Burse in his official and individual capacities.

Section 1983 does not create substantive rights but, rather, "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States. . . ." *Lugar v.*

*Edmonson Oil Co.*, 457 U.S. 922, 924 (1982); *Mertik v. Blalock*, 983 F.2d 1353, 1359 (6th Cir. 1993). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989) (additional citations omitted)). Dr. Silitonga's § 1983 claims in Counts Five and Six allege violations under the Fourteenth Amendment.

Generally, Government entities will not be "be held liable solely because it employs a tortfeasor . . . under a respondeat superior theory." *Mills v. City of Barbourville*, 389 F.3d 568, 577 (6th Cir. 2004) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). However, the Sixth Circuit in *Mills* held,

> Governmental entities may be liable under section 1983 only for the formal official acts and policies, and also, under some circumstances, for practices "so permanent and well settled" as to constitute established custom. In *Monell*, the Supreme Court held that municipalities may be sued for damages under §1983 when the "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by the body's officers." A governmental entity will not, however, be held vicariously liable under § 1983 for the random, unauthorized acts of its employees.

389 F.3d at 576-77 (citations omitted). The United States Supreme Court has also held, "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 658.

In responding to Defendants' Motion for Summary Judgment, Plaintiffs ask the Court to hold KSU liable for the actions of President Burse and the Board of Regents under this "custom" or "practice" theory of vicarious liability. [R. 19 at 21.] The record indicates that the Board of

Regents, as KSU's governing body, "delegate[d] the responsibility of the running of the institution to the president and his or her designees." [R. 17-7 at 20.] Additionally, the Board of Regents did not require Burse to notify them prior to the termination of senior-level administrators or tenure-track professors. [*Id.*] The record further indicates that Burse, in a Cabinet meeting, notified those present that, "[t]he Board told me that they don't care who I fire or what I do . . . as long as I clean up this place around here. And they would take the lawsuits, that they didn't care how many lawsuits." [R. 17-8 at 21.] Testimony suggests that Burse made it clear that he did not care about the institutional policies. [*Id.* at 19-21.] Drawing the facts in the light most favorable to Plaintiffs, the record indicates that there was a sufficient "policy" or "custom" at KSU that would impose vicarious liability on KSU for certain of Burse's conduct allegedly unconstitutional under § 1983. Therefore, Dr. Silitonga's § 1983 claims in Counts Five and Six will survive sovereign immunity. The Court will now turn to whether the § 1983 standard is met as to each Count.

## 1

As stated, Count Five sets forth a federal claim that Defendants violated 42 U.S.C. § 1983 by depriving Dr. Silitonga of her Fourteenth Amendment due process rights. When analyzing § 1983 claims, courts engage in the following two-step analysis: (1) determine initially whether a protected property or liberty interest exists; and (2) determine what procedures are required to protect that interest. *Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990).

The § 1983 claim in Count Five alleges that Defendants failed to notify Dr. Silitonga of the charges leading to her termination prior to her termination and failed to afford her an opportunity to be heard on those charges, which violated her Fourteenth Amendment due process

rights. [R. 1 at 17-22.] In *Bailey v. Floyd County Bd. of Educ.*, the Sixth Circuit noted that the Fourteenth Amendment prohibits state actors from depriving an individual of property without due process of law. 106 F.3d 135, 140-41 (6th Cir. 1997) (citing U.S. Const. amend. XIV). The court explained that "government employees with a protectable property interest in their jobs are ordinarily entitled to pre-deprivation notice of the charges, an explanation of the employer's evidence, and an opportunity to present their account of the events." *Id.* at 141 (citing *Cleveland Bd. of Educ. V. Loudermill*, 470 U.S. 532, 546 (1985). Absent such a property interest, however, an employee is "not entitled to any pre-deprivation process whatsoever." *Id.* (citation omitted).

In answering the first question of the analysis set forth above, whether a property interest exists, it is settled law that "college professors and staff members dismissed *during the terms of their contracts* have interests in continued employment that are safeguarded by due process." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-577 (1972) (emphasis added) (citing *Wieman v. Updegraff*, 344 U.S. 183 (1952)); *See also Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990); *Whitsel v. Southeast Local School District*, 484 F.2d 1222, 1229 (6th Cir. 1973). Consequently, because the record indicates Dr. Silitonga was still under her 2014-2015 contract at the time of her termination [*see* R. 19 at 23; R. 19-4 at 10-11], Dr. Silitonga had a protectable property interest in her employment.

Turning now to the second question of the analysis, what protections are required to protect that property interest, the Sixth Circuit has held "government employees with a protectable property interest in their jobs are ordinarily entitled to pre-deprivation notice of the charges, an explanation of the employer's evidence, and an opportunity to present their account of the events." *Bailey*, 106 F.3d at 141. Here, Defendants do not articulate a clear reason why summary judgment should be granted. [*See* R. 12-1 at 7-8.] Defendants seem to suggest that Dr.

29

Silitonga's termination came as a result of insubordination, which might constitute 'for cause" under the KSU Faculty Handbook, and that she was employed as an associate dean, which would not afford her the protections codified at KRS § 164.360. [R. 12-1 at 7-8.]

However, the record indicates that while she was indeed employed as an associate dean, she was also employed as a tenure-track professor. [*See* R. 19-7.] Therefore, she had a property interest in her continued employed while under contract. *See Bailey*, 106 F.3d at 141. Further, Dr. Silitonga received a letter in December 2014, which notified her that her appointment would not be renewed. [R. 19-8.] However, that letter does not put Dr. Silitonga on notice as to any charges brought against her or a statement of the evidence to be used for any potential termination prior to the expiration of her contract. [*See id.*] Dr. Silitonga received another letter, dated June 5, 2015, in which her termination was made immediately effective, again without any notice of charges against her or an opportunity for a pre-deprivation hearing. [R. 19-2.]

Having determined that Dr. Silitonga had a protectable property right in her continued employment while under contract, and that she was terminated without pre-deprivation notice and opportunity for a hearing as required by federal case law and state statute, the Court will deny summary judgment as to Dr.Silitonga' § 1983 claim, as alleged in Count Five.

**2**

Count Six sets forth claims that Defendants violated 42 U.S.C. § 1983 and § 2 of the Kentucky Constitution by depriving Plaintiffs of their Fourteenth Amendment equal protection rights and by selectively enforcing KRS § 164.360 and the KSU Faculty Handbook. [*See* R. 1 at 21-22.] In doing so, Plaintiffs incorporate all facts previously alleged in their Complaint. [*Id.* at 21.] The Court has already established that Dr. Silitonga's claim in Count Six meets the general § 1983 pleading standard. *See supra* Section II.E.

However, for a plaintiff to establish an equal protection claim under § 1983 against a public employer, "the plaintiff must show that the employer made an adverse employment decision with discriminatory intent and purpose." *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000) (citations omitted). Additionally, an equal protect claim "may arise when a plaintiff is subjected to selective enforcement of the laws in retaliation for the exercise of a fundamental right." *Carmen's East, Inc. v. Huggins*, 995 F.2d 1066 (Table), 1993 WL 172879, No. 92-1590 at *1 (6th Cir. 1993) (citing *Oyler v. Boyles*, 368 U.S. 448, 456 (1982)). A preponderance of the evidence must show that the plaintiff suffered "intentional and purposeful discrimination." *Weberg*, 229 F.3d at 514 (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988)). "The plaintiff may not simply introduce evidence of discriminatory intent and suggest that such intent could have played a role in an adverse employment decision. Rather, a plaintiff is required to demonstrate that the adverse employment decision would not have been made "but for" her [sex]." *Id.* (citations omitted). A plaintiff may bring an equal protection claim under either a disparate impact theory or a disparate treatment theory. *Id.*

Here, Dr. Silitonga claims § 1983 violations related to the selective enforcement of KSU's Faculty Handbook and state statutory law. [R. 1 at 22.] In doing so, she relies heavily on all of her previous assertions, but mainly she relies on the claim set forth in Count Five that her Fourteenth Amendment due process rights were violated. [*Id.*] However, she does not claim or establish that Defendants acted with intent. [*See id.*] She also fails to claim disparate impact or disparate treatment. [*See id.*] Because equal protection law requires a plaintiff to show that the adverse employment decision was made with discriminatory intent, *see Weberg*, 229 F.3d at 522, Defendants will be granted summary judgment as to Count Six.

## III

Title VII and § 1983 employment discrimination claims are serious. While the facts of some cases may be dismissed summarily, the facts of this case do not lend to such dismissal. Regarding this case, to claim that the parties did not start off their working relationships well or that the parties lacked affection for one another [*see* R. 12-1 at 5], would be quite dismissive of the facts contained in the record. While not all of Plaintiffs' claims survive summary judgment, drawing all reasonable inferences in favor of the Plaintiffs demand further litigation of certain other claims.

In summation, and for the reasons articulated above, Plaintiffs' Count Two will survive summary judgment as it relates to the Title VII retaliation claim against KSU, the Board of Regents, and each of the Regents in their official capacities, as well as the KCRA retaliation claim against KSU, the Board of Regents, each of the Regents in their official capacities and President Burse in his official and individual capacities. Likewise, Plaintiffs' Count Three will survive summary judgement with regard to the Title VII claims against KSU, the Board of Regents, and each of the Regents in their official capacities, as well as the KCRA claims against KSU, the Board of Regents, each of the Regents in their official capacities, and Burse in his official and individual capacities. Lastly, Dr. Silitonga's §1983 claims, set forth in Count Five, will survive summary judgment against KSU, the Board of Regents, each of the Regents in their individual capacities, as well as Burse in his official and individual capacities.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby ordered as follows:

1. As to Count One, Defendants' Motion for Summary Judgment [**R. 12**] will be
   **GRANTED**;

2. As to Count Two, Defendants' Motion for Summary Judgment [**R. 12**] will be:

   a. **GRANTED** with regard to all Title VII conspiracy claims, all KCRA conspiracy claims, all Tile VII retaliation claims against each of the Regents in the individual capacities and President Burse in his official and individual capacity, and all KCRA retaliation claims against each of the Regents in their individual capacities; but

   b. **DENIED** with regard to the Title VII retaliation claims against KSU, the Board of Regents, and each of the Regents in their official capacities, as well as the KCRA retaliation claims against KSU, the Board of Regents, each of the Regents in their official capacities and President Burse in his official and individual capacities;

3. As to Count Three, Defendants' Motion for Summary Judgment [**R. 12**] will be:

   a. **GRANTED** with regard to the Title VII claims against each of the Regents in their individual capacities and President Burse in his official and individual capacities, as well as the KCRA claims against each of the Regents in their individual capacities; but

   b. **DENIED** with regard to the Title VII claims against KSU, the Board of Regents, and each of the Regents in their official capacities, as well as the KCRA claims against KSU, the Board of Regents, each of the Regents in their official capacities, and President Burse in his official and individual capacities;

4. As to Count Four, Defendants' Motion for Summary Judgment [**R. 12**] will be **GRANTED**;

5. As to Count Five, Defendants' Motion for Summary Judgment [**R. 12**] will be:

   a. **GRANTED** with regard to Dr. Silitonga's § 1983 claims against each of the Regents in their individual capacities, all of Dr. Tsegaye's Title VII claims, and all of Drs. Tsegaye and Silitonga's state constitutional claims;

   b. **DENIED** with regard to Dr. Silitonga's § 1983 claims against KSU, the Board of Regents, each of the Regents in their official capacities, and President Burse in his official and individual capacities; and

6. As to Count Six, Defendants' Motion for Summary Judgment [**R. 12**] will be **GRANTED**;

This the 30th day of June, 2018.

Gregory F. Van Tatenhove
United States District Judge